VAUGHAN ENTERPRISES, INC., d/b/a Help–U–Sell of Adams County, an Illinois Corporation, Plaintiff,

v.

QUINCY ASSOCIATION OF REALTORS, INC., an Illinois Corporation, et al., Defendants.

No. 95–3302.

United States District Court, C.D. Illinois, Springfield Division.

Dec. 22, 1997.

William Panichi, Springfield, IL, Norvel E. Brown, Jr., Centralia, IL, for Vaughan Enterprises Inc., an Illinois Corp., plaintiff.

John O'Brien, Quincy, IL, defendant pro se.

Robert E. Gillespie, Byron G. Cudmore, Rendi L. Mann-Stadt, Hinshaw & Culbertson, Springfield, IL, for Quincy Ass'n of Realtors, defendant.

## OPINION

RICHARD MILLS, District Judge.

This cause is before the Court on Defendant Quincy Association of Realtors, Inc.'s Motion for Summary Judgment.

## I. BACKGROUND

Defendant Quincy Association of Realtors ("the Association") is a not-for-profit corporation that has as its members approximately 95% of all persons and firms engaged in the business of real estate brokerage in Adams County. The Association operates a Multiple Listing Service ("MLS") which lists and describes properties offered for sale. The listings also set forth the commissions paid to brokers or agents who sell the property listed therein.

Real estate brokers who are members of the Association are able to offer properties they are attempting to sell in the MLS by filing certain information with the Association. The Association has established rules and regulations that govern the practice of placing properties in the MLS. One such rule is that the listing agent must provide the amount of commission that will be split or paid to another agent who provides a buyer for the listing broker's property. This commission is known as the "co-broke" commission or the "commission split." The Association requires that the co-broke commission be listed as either a percentage of the gross selling price or a definite dollar amount. The Association does not, however, fix, recommend, or maintain commission fees or the division of fees between cooperating participants.

Plaintiff Vaughan Enterprises, Inc. d/b/a Help–U–Sell of Adams County ("Help–U–Sell") was a corporation that offered sellers of homes a choice on how to market their property based on the services rendered.

One option was to list their home on the MLS, in which case the seller would be charged 6% of the selling price. If a non Help–U–Sell agent sold a Help–U–Sell property listed in the MLS, Help–U–Sell would split the commission 50/50.

The second option Help–U–Sell offered its clients was to not list the property in the MLS and have Help–U–Sell show the property and do most of the footwork. The seller would be charged a flat fee plus a show fee. The third option was to not list the property in the MLS and the seller would do their own showings and their own open houses and would be charged a flat fee. These last two options are called "exclusive listings" because the properties are not listed in the MLS. On its exclusive listings, Help–U–Sell offered a show fee of $500 or 1% of the sales price to any broker or agent who sold the property.

In June 1993, several listings appeared in the MLS that stated "call office for commission split." Help–U–Sell alleges that the member brokers described the co-broke commission in this fashion so that they could offer the normal commission to all other real estate brokers except Help–U–Sell agents and brokers.

On August 31, 1993, the Association officers were made aware of the fact that members were stating "call office" in lieu of listing a percentage or monetary amount. The Association sent a memorandum on August 31, 1993 to all of its MLS designated members advising them that: "It has come to our attention that the amount of compensation offered to other MLS participants for their services is not being set forth." The memorandum then described the requirements for listings, i.e. the need to list either a percentage or a monetary amount for the commission split, and stated that failure to comply with the rule would result in the listing being removed from the MLS.

Shortly thereafter, the practice of listing "call office" ceased. Subsequently, some listings then stated that the co-broke commission would be $500 or 1% plus reciprocity. Help–U–Sell alleges that this printed commission was intended only for her. Despite this listing, other brokers who showed partic-

ular property would receive the usual ⁵⁰⁄₅₀ split of the commission.

In its Amended Complaint, Help–U–Sell alleges that the Association conspired to restrain trade in violation of Section 1, 15, and 26 of the Sherman Act, and sections 4 and 6 of the Clayton Act. Specifically, Help–U–Sell alleges that the Association was the means for its member real estate brokers and agents to enter into conspiracies to fix prices, control markets, and force Help–U–Sell out of business. The Amended Complaint further alleges that the Association used its committees and the MLS, which it administrated, in violation of the anti-trust laws.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c); *see Ruiz–Rivera v. Moyer*, 70 F.3d 498, 500–01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

## III. ANALYSIS

Section 1 of the Sherman Act provides, in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. To state a claim under § 1 of the Sherman Act, a plaintiff must allege: 1) a contract, combination or conspiracy among two or more persons, 2) which unreasonably restrains trade, and 3) is in or affects interstate commerce. *Denny's Marina Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1220 (7th Cir.1993).

The Association argues that Plaintiff has not raised a question of material fact establishing that a conspiracy existed or that it participated in the alleged conspiracy. Because the Court finds that Plaintiff has not raised a question of material fact regarding the Association's participation in the alleged conspiracy, it will not address the Association's first argument that a conspiracy did not exist and will assume, for purposes of this motion, that Plaintiff had presented sufficient evidence that a conspiracy did exist.

Plaintiff's allegations against the Association are that it assisted the other defendants and used its MLS and its committees to further the acts in restraint of interstate trade or commerce in the real estate brokerage business in Quincy, Illinois. The Association argues that Plaintiff: 1) has failed to identify any action taken by the Association or its Board of Directors that specifically caused or facilitated allegedly false co-brokerage fees to be listed in the MLS; 2) has failed to allege any direct or circumstantial evidence that the Association conspired to disparage Plaintiff and to exclude Plaintiff's agents and employees from the Association's activities and committees; 3) failed to present any direct or circumstantial evidence that the Association planned or encouraged the practice of having brokers refuse or delay in showing Plaintiff's listed properties.

The Association relies on *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053 (5th Cir.1985), *cert. denied* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). In *Park*, the plaintiff

alleged that the defendants (the El Paso Board of Realtors and 68 El Paso realty companies) conspired to boycott plaintiff's real estate company. *Id.* at 1057. As to the participation of the Board in the alleged conspiracy, the plaintiff alleged that the Board participated in the plan to deny him benefits of membership, including the right to have commission charges split in accordance with the MLS listings, the right to be present when contracts were presented, and the right to be free of disparagement by other Board members. *Id.* at 1061.

The appellate court, in reversing the jury's verdict against the Board, held that the plaintiff failed to show that any of the Board's conduct implicated it in the alleged conspiracy. The court further stated:

> The Board is less than the sum of its parts; the fact that some members of the Board participated in the boycott conspiracy does not imply that the Board itself participated in the conspiracy. To support such an inference, [plaintiff] needed to introduce evidence that the Board participated or condoned the alleged rules violations.

*Id.*

Similarly, in the instant case, Plaintiff must introduce evidence that the Association participated in or condoned the alleged conspiracy. Defendant claims that Plaintiff cannot do so.

First, Plaintiff has admitted several portions of the Association's Statement of Undisputed Fact:

> 16. [The Association] as an organization never took any action to violate MLS rules and regulations on commission splits. . . .
> 17. [The Association] as an organization never participated in any plan to offer punitive commission splits to Plaintiff or Plaintiff's agents. . . .
> 18. [The Association], as an organization, is not alleged to have either participated in nor encouraged a practice of individual Realtors refusing or delaying in showing Plaintiff's listed properties. . . .
> 19. [The Association] as an organization, is not alleged to have either participated in nor approved of the alleged disparagement of Plaintiff's business.

Consequently, Plaintiff admits that the Association never participated in any plan to offer punitive commission splits, never participated in or encouraged any refusals to show Plaintiff's properties, and never participated in or approved any alleged disparagement.

The Association also points to evidence that it took affirmative measures to have its membership refrain from practices that are alleged to have constituted anti-trust actions. The Association points out that Lois Jacobsen, the Association's President from January 1993 to December 1994, Nancy Anderson, the Executive Officer, and William Mays, the Association's Board attorney, all took action to uphold the anti-trust laws and enforce MLS regulations.

Specifically, Anderson testified that prior to August 31, 1993, she telephoned each Association member and asked them to abide by MLS rules and submit percentage or definite dollar amounts. The August 31, 1993 letter, authored by Mays, also demonstrates the Association's proactive conduct to enforce the Association's MLS rules. Furthermore, Jacobsen testified as to a meeting attended by Anderson where the Association members were alleged to have been discussing action that could constitute antitrust activity. Anderson informed the members that their actions could be illegal and then left the meeting. Anderson then returned to the meeting and distributed educational literature about avoiding activities that could constitute anti-trust. Finally, the Association also had an attorney from the Illinois Association of Realtors address the membership on the issue of anti-trust practices.

In response, Plaintiff argues that Jacobsen, Anderson and Mays were terminated or caused to resign by the Association and that the subsequent leadership took no actions to quell the anti-competitive activities of the defendants. Additionally, Plaintiff claims the subsequent leadership excluded Plaintiff from committee membership and Association activities. According to Plaintiff, the removal of persons who would enforce The Association's rules and regulations and the exclusion of Plaintiff from committees and functions are the very actions which the Fifth Circuit

found lacking in *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053.

However, Plaintiff makes these broad assertions without any citation to the Record other than, in a few instances, a reference to a deposition but no page number. It is the parties' responsibility to highlight factual averments and cite the record evidence to confirm the fact. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22. (7th Cir. 1994). "[D]istrict courts are not obliged in our adversary system to scour the record...." *Id.* at 922. Thus, the Court will not consider the "evidence" as it is unsupported.

Plaintiff is therefore left with one supported fact in her claim against the Association: that after Jacobson, Anderson, and Mays were no longer officers of the Association, Plaintiff and her agents were not given positions on Committees. From this, Plaintiff asks that it be allowed to proceed to trial. The Court cannot do so.

Plaintiff must present more than a mere scintilla of evidence to demonstrate a genuine issue of material fact. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. A genuine issue of material fact does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. The Court finds that Plaintiff has not presented sufficient evidence such that a jury could return a verdict in its favor.

Finally, the Court finds the case relied upon by Plaintiff distinguishable. In *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143 (8th Cir.1979), the plaintiff brought an anti-trust action against the Greater Minneapolis Area Board of Realtors and 19 of its members, alleging that the defendants had contracted, combined, or conspired to fix and maintain brokerage fees charged in connection with the sale of real property. *Id.* at 1145. The appellate court reversed the district court's grant of summary judgment because it found a genuine issue of material fact concerning involvement of the Board in the alleged conspiracy. *Id.*

The *Penne* plaintiff was, like Plaintiff in the instant case, a realty company that offered its customers a lower commission rate. *Id.* Unlike the present case, however, the plaintiff in *Penne* presented evidence that the Board at one time had a rule which allowed members to base the division of commission fees on the brokerage fee the selling firm regularly charged, a practice the court termed a "punitive split." *Id.* at 1146. At the same time, the Board began to print a roman numeral on the MLS listings. The roman numeral indicated the commission rate at which the listing firm was charging the seller on that listing. *Id.* at 1147.

Even though the Board later retracted its written rules concerning the division of commission on cooperative sales, the Board continued the roman numeral system in its MLS listing circulars. The punitive split practice continued as well despite the Board's retraction of the rule. *Id.* The plaintiff alleged that after he applied for admission to the board, several firms began to divide commissions on cooperative sales of its listings on the basis of the lowest fee offered to the general public by the selling firm [1]. *Id.*

The court found that the Board's dissemination of the MLS listings with the roman numeral system (indicating the commission each real estate agency charged) was a form of "interseller price verification." *Id.* Specifically, the court determined that sufficient evidence existed as to whether the Board's dissemination of the commission rates charged by each real estate agency facilitated its members practice of dividing commissions with plaintiff on a punitive basis. *Id.*

1. The example set forth by the *Penne* court explains this process. Suppose firm A generally charges a commission equal to 4% of the selling price and firm B generally charges a commission equal to 7% of the selling price and both firms divide commissions on cooperative sales on a straight 55/45 basis. Firm B may decide to apply a "punitive split" to firm A because firm A takes a 45% cut of 7% when it sells one of firm B's properties but firm B takes 45% of only 4% when it sells one of firm A's properties. Therefore, firm B may decide that instead of dividing its full 7% commission with firm A when firm A sells one of B's listings, firm B will divide the commission based on what firm B would have earned had it sold one of firm A's properties (45% of a 4% commission). *See Penne*, 604 F.2d at 1146.

In contrast, Plaintiff in the instant case has presented no evidence that the Association adopted any policies relating to cooperative sales nor that the Association identified the commission rate at which a listing firm was charging the seller on a particular listing. In *Penne*, the Board disseminated the commission rates each agency charged its clients. The defendant real estate agencies were alleged to have divided commissions with plaintiff based on what commission plaintiff charged. Therefore, an inference could be raised that the Board's practice of disseminating the commissions charged facilitated the conspiracy of the other defendants. In the instant case, Plaintiff has presented no such evidence. Plaintiff has not presented evidence that would infer that the Association participated in, condoned, or facilitated the activities of the other defendants in the alleged conspiracy.

Consequently, because Plaintiff has failed to present the Court with evidence that demonstrates that a genuine issue of material facts exists, the Association is entitled to summary judgment.

*Ergo*, the Association's Motion for Summary Judgment is ALLOWED, with costs.